Nancy K. RAND, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant.

No. CIV.A. 04–10058–WGY.

United States District Court,
D. Massachusetts.

Feb. 24, 2005.

Rayford A. Farquhar, United States Attorney's Office, Boston, MA, for Jo Anne B. Barnhart, Defendant.

Stephen L. Raymond, Esq., Law Office of Stephen L. Raymond, Esq., Haverhill, MA, for Nancy K. Rand, Plaintiff.

*MEMORANDUM AND ORDER*

YOUNG, Chief Judge.

## I. INTRODUCTION

This action was brought pursuant to Section 205(g) of the Social Security Act, codified at 42 U.S.C. § 405(g). The plaintiff Nancy K. Rand ("Rand") requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her Disability Insurance Benefits ("DIB"). Rand argues that the decision of the Administrative Law Judge ("hearing officer") was not supported by substantial evidence, erroneously applied the governing legal standards for determining disability, and was actually contrary to the evidence presented. Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings [Doc. No. 9] at 4 ("Pl.'s Mem."). Rand is seeking the reversal of the final judgment of the Commissioner, and requests that the matter be remanded for a new hearing. *Id.* at 1. In response, the Commissioner filed a motion to affirm her decision. Def.'s Mot. for Order Affirming the Decision of the Commissioner [Doc. No. 11].

## II. BACKGROUND

### A. Procedural History

Rand filed an application for DIB on June 7, 2000, claiming an onset of disability on January 15, 1999. R. at 27–28.[1] The DIB claim was denied initially and on reconsideration. *Id.* at 27. Rand filed her request for a hearing on March 27, 2001, which was first held on February 20, 2002. *Id.* A supplemental hearing was held on November 25, 2002 in Boston, Massachusetts. *Id.* On March 27, 2003, the hearing officer, Robert L. Halfyard, denied Rand's claim after conducting the hearings and

---

1. Citations to both the Administrative Record and Supplemental Administrative Record are identified as "R" followed by the page number, as the documents in the supplemental record continue with the pagination from the first.

reviewing the evidence on record. *Id.* at 36. According to the hearing officer, Rand did not establish her eligibility for DIB because: (1) she did not demonstrate that her physical ailments medically equal the listed impairments under the Social Security Act; (2) she retains the residual functional capacity to perform certain forms of sedentary work; (3) her allegations regarding her impairments were not entirely credible in light of the medical record; and (4) she was not living with a "disability," as defined by the Social Security Act at any time through the issuing of the decision. *Id.* at 35–36. Following the hearing officer's unfavorable decision, Rand petitioned the Appeals Council of the Social Security Administration for a review on May 30, 2003. Pl.'s Mem. at 2. The Appeals Council denied Rand's request for review on November 6, 2003, making the hearing officer's written decision the final decision of the Commissioner. *Id.* On January 9, 2004, Rand filed her Complaint with the United States District Court for the District of Massachusetts. *See* Compl. at 1–3.

## B. Facts

Rand was born on September 25, 1954 in Massachusetts. R. at 322. She is married with two children and currently resides in Haverhill, Massachusetts. *Id.* at 323–24. Rand has a college education, and worked in the New Hampshire public school system for 23 years until the alleged onset of her disability in January of 1999. Pl.'s Mem. at 2–3; R. at 327.

In April of 2002, the New Hampshire retirement system granted Rand a permanent disability pension of one thousand dollars per month after it was determined that she could no longer teach. R. at 41. Rand was deemed to be a liability in the classroom due to the pain and weakness in her leg that caused her to trip and fall frequently. *Id.*

Rand testified at her second appearance before the hearing officer on November 25, 2002 that the pain caused by her physical ailments radiated down her right leg, creating a numb feeling along with a tingling and burning sensation from her knee down to her toes. *Id.* at 44. Rand also claimed that she experiences pain and numbness in both arms, from the neck down, and feels a burning sensation when trying to hold a cup, pen, or telephone. *Id.* She feels discomfort when sitting and prefers to stand, but is forced to lie down after a period of time to alleviate the pain in her back and her lower extremities. *Id.* According to Rand, the pain interferes with her sleep, affects her ability to drive or ride in cars for long distances, prevents her from going on family trips and school fieldtrips with her two sons, and impacts other daily activities. *Id.* at 52.

Following her retirement as a school teacher, Rand sought part-time work in Haverhill so she would not have to drive long distances. *Id.* at 56. With the limitations imposed by her physical problems and the downturn in the economy, Rand was unable to find suitable work in the local school system. *Id.* Rand is therefore no longer looking for work to supplement her retirement pension. *Id.* at 55–56.

## C. Medical Evidence

Rand initially sought treatment in 1998 with Bruce Cook, M.D. ("Dr.Cook") for persistent back pain that dated back five to six years. *Id.* at 241. The pain became more severe after she slipped and fell on a wet floor. *Id.* Dr. Cook's physical examination produced essentially normal results, and he suspected a soft tissue injury. *Id.* at 241–42. He prescribed Naprosyn and encouraged Rand to begin an exercise program to alleviate the pain. *Id.* at 242. Rand told Dr. Cook that the pain was diminishing in January of 1999, but an

MRI showed a clear-cut disc herniation. *Id.* at 239. Dr. Cook performed a lumbar laminectomy and disc excision in March of 1999. *Id.* at 29. By June of 1999, Rand's back pain was diminishing, but was still present. *Id.* Rand's sleeping patterns were improving, she was walking more, and she was gradually increasing her overall activities following the surgery. *Id.* Dr. Cook noted, however, that Rand was still experiencing occasional weakness in dorsiflexion in the right foot and numbness after walking long distances. *Id.* Rand began complaining of numbness in her right arm and hand in August of 1999, following a fall. *Id.* Dr. Cook diagnosed Rand with post-traumatic carpal tunnel syndrome in the right arm after conducting an examination. *Id.* at 29–30. Rand visited Dr. Cook again in June of 2000 complaining of right arm pain. He noted that she had an absent triceps reflex on the right side with weakness in the muscle. *Id.* at 30. An MRI revealed herniations of the cervical spine. *Id.* Dr. Cook noted improvement in Rand's physical ailments in later examinations that year. *Id.* By September of 2001, however, Rand was experiencing numbness and tingling in her hands. *Id.* Rand underwent EMG and nerve conduction studies, which revealed findings consistent with bilateral carpal tunnel syndrome. *Id.* Dr. Cook prescribed splints for both of Rand's hands. *Id.*

Rand also sought treatment with Sara Lee, M.D. ("Dr.Lee"), in February of 2000. *Id.* From February to April, Dr. Lee conducted physical examinations of Rand, finding that she had full range of cervical motion and that her toes were flacid in spite of Rand's complaints of spasms in her right foot. *Id.* Dr. Lee also performed EMG and nerve conduction studies and found them to be normal. *Id.* Dr. Lee concluded that Rand could continue working in a more limited capacity in spite of Rand's belief that she was "100% disabled" and incapable of any kind of work. *Id.* at 192.

In October of 2001, Rand was examined by B. Eugene Brady, M.D. ("Dr.Brady"), after experiencing swelling and pain in her left knee. *Id.* at 30. Dr. Brady diagnosed Rand with patella tendinitis with mild chondromalacia patella and mild arthritis. *Id.*

Donald Pettit, M.D. ("Dr.Pettit"), also examined Rand in May of 2002, and found that she did not have tenderness in her neck or spasms. *Id.* There was no motor or sensory reflex loss in her upper extremities beyond an absent right triceps reflex. *Id.* at 30–31. Rand felt tenderness in her lower back, but was able to extend fully. *Id.* at 31. Based on the results of the examination, Dr. Pettit estimated that Rand could safely lift up to ten pounds, walk or stand at least two hours out of eight hours, and sit without restriction. *Id.* at 304–05.

Rand also experienced a form of psychological impairment as a result of her physical problems. *Id.* at 31. In August of 2000, Rand was examined by Robert Sharpley, M.D. ("Dr.Sharpley"). *Id.* Dr. Sharpley noted that her sleep was disturbed, and that Rand reported weight gain and occasional problems with maintaining her focus and concentration. *Id.* Dr. Sharpley diagnosed Rand with a major depressive reaction. *Id.*

Robert Moverman, Ph.D. ("Dr.Moverman") met with Rand for an examination in June of 2001. *Id.* Rand's mood was improving, and she admitted that her stress level and feelings of depression were decreasing. *Id.* Dr. Moverman believed it was likely that episodic stressors were exacerbating Rand's physical ailments, and recommended psychotherapy to help alleviate her emotional problems. *Id.*

Rand was examined by Diane Stoler, Ed.D. ("Dr. Stoler"), in May of 2002. *Id.* Rand complained of chronic pain, disturbed sleeping patterns, fatigue, feelings of sadness over her limited physical ability, short-term memory loss, confusion, and poor concentration. *Id.* A mental status examination, however, showed that Rand's anxiety level, stream of thought, judgment, and long-term memory were all normal in relation to her age and situation. *Id.* Dr. Stoler diagnosed Rand with psychological factors affecting a medical condition. *Id.* at 297. Dr. Stoler stated that Rand's level of pain and fatigue would prevent her from engaging in any occupational activity at the time, but believed that her prognosis was good if she underwent a combination of physical and psychological therapies. *Id.* at 298–99.

## III. DISCUSSION

### A. Standard of Review

■ The Court's review of the Commissioner's decision to deny disability benefits is limited by section 405(g) of the Social Security Act, which requires that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). A showing of substantial evidence requires "more than a mere scintilla," and may include "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Richardson,* 402 U.S. at 401, 91 S.Ct. 1420 (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). The Court must therefore affirm the Commissioner's decision, even if the record could conceivably justify a different outcome, as long as it is supported by substantial evidence. *Evangelista v. Secretary of Health & Human Servs.,* 826 F.2d 136, 144 (1st Cir.1987).

■ The Commissioner is responsible for examining the claimant's credibility, drawing inferences from the record, and making factual determinations based on the evidence. *Irlanda Ortiz v. Secretary of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir.1991). The Commissioner is also obligated to present full and detailed findings to support her conclusions. *Small v. Califano,* 565 F.2d 797, 801 (1st Cir.1977).

### B. Security Disability Standard and the Hearing Officer's Decision

Under the Social Security Act, a claimant must provide evidence establishing that she is "disabled" as the term is defined by the statute. *Deblois v. Secretary of Health & Human Servs.,* 686 F.2d 76, 79 (1st Cir.1982). The Social Security Act provides that:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A). The Social Security Administration has established regulations that lay out a five-step analysis to determine whether or not a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s).

If you do not have a severe medically determinable physical or mental impairment that .meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of production and proof in relation to the first four steps of the analysis. *Freeman v. Barnhart,* 274 F.3d 606, 608 (1st Cir.2001). If the claimant meets her burden of proof as to the first four steps, the Commissioner must then present evidence that the claimant maintains the residual functional capacity to perform specific jobs in the national economy. *Id.* (citing *Arocho v. Secretary of Health & Human Servs.,* 670 F.2d 374, 375 (1st Cir.1982)).

The hearing officer found that Rand has not engaged in substantial gainful work activity since the alleged onset of her disability in January of 1999. R. at 28. According to the hearing officer, Rand also met her burden of producing sufficient evidence to establish that her medically identifiable impairments are severe enough to limit her physical or mental ability to do basic work activities. *Id.* at 28–29. The hearing officer, however, determined that Rand's physical and mental impairments are not severe enough to meet or equal one of the impairments listed in appendix 1. *Id.* at 29. After considering the entire record, the hearing officer found that the claimant's subjective statements about her pain and level of physical incapacity were not entirely credible in light of her medical history and the reports of her treating and examining physicians. *Id.* at 32. The hearing officer accepted Rand's claim that she is no longer physically able to work in her former capacity as an elementary school teacher, but he rejected her assertion that she is entirely unable to work in any field. *Id.* at 32–35. Based on the clinical evidence and the testimony of the vocational expert at the second hearing held on November 25, 2002, the hearing officer concluded that Rand retains the residual functional capacity to perform certain sedentary forms of work, and that her educational background and experience provide her with transferable skills that are useful in a number of fields that exist in the national economy. *Id.* at 33–35. Accordingly, the hearing officer determined that Rand is not under a disability as defined by the Social Security Act. *Id.* at 35.

## C. Rand's Arguments

1. Rand's Charge that the Hearing Officer's Decision is not Supported by Substantial Evidence

██ After evaluating the entire record, the hearing officer concluded that Rand's claim of total incapacity was not fully consistent with the statements of her treating

and examining physicians. R. at 32. The hearing officer pointed out that Dr. Cook's conclusion that Rand is unable to work in any capacity is not supported by the evaluations of several other physicians who examined the claimant, and does not entirely comport with Dr. Cook's own findings. *Id.* Dr. Lee and Dr. Pettit, Rand's most recent consulting physician before the eligibility hearing, both indicated that, despite her impairments, the claimant was capable of performing some work. *Id.* at 32–33. To further cast doubt on Rand's claim, Hubert Caplan, M.D. ("Dr. Caplan"), a medical expert, testified at the November 25, 2002 hearing that Rand's physical and emotional impairments did not meet or equal those listed under current Social Security regulations. *Id.* at 31. Dr. Caplan found Dr. Pettit's evaluations of Rand to be consistent with the clinical record. *Id.* at 32. The hearing officer also noted that Rand consistently showed good lumbar range of motion, negative straight leg raising, and did not experience spasms while being evaluated by her physicians. *Id.* at 32–33.

Regarding Rand's psychological condition, the hearing officer did not accept Dr. Stoler's finding that the claimant's mental impairment severely limits her ability to work in any capacity. *Id.* at 33. According to the hearing officer, Dr. Stoler's evaluation was based almost entirely on Rand's subjective complaints and was not adequately supported by the objective medical evidence. *Id.* Nancy Keuthen, Ph.D. ("Dr. Keuthen"), the non-examining reviewing Disability Determination Services ("DDS") physician, indicated that Rand experienced relatively mild restrictions in her daily functioning, ability to concentrate, and that the claimant had no difficulty in maintaining her overall ability to socially function. *Id.* Her opinion echoed the evaluations of Dr. Sharpley and Dr. Moverman, both of whom found that Rand did not experience significant work-related limitations. *Id.*

The hearing officer also called upon a vocational expert at the November hearing to name specific jobs that could be performed by Rand, given her physical limitations. *Id.* at 34. The vocational expert testified that her age, education, and transferable skills gained as a teacher allowed Rand to make an adjustment in her working life and thereby adopt a new occupation, in spite of the restrictions placed on her ability to work in certain fields. *Id.* Specifically, the vocational expert testified that Rand could work in less physically demanding roles as a receptionist, an information clerk, or a dispatcher. *Id.*

The hearing officer did in fact evaluate the available objective medical and vocational evidence in reaching his conclusion that Rand is physically and emotionally capable of working in some capacity. The hearing officer's decision was supported by substantial evidence.

2. Rand's Argument that the Hearing Officer Erroneously Reached the Conclusion that Her Subjective Claims were not Credible

■ Rand argues that even if the hearing officer concluded that her claims of severe pain and incapacity were not supported by objective evidence, he nonetheless failed "to follow the proper standards for pain evaluation and credibility provided in *Avery v. Secretary of Health & Human Servs.*, 797 F.2d 19 (1st Cir.1986)." Pl.'s Mem. at 6. If the claimant's claim of pain is not supported by objective findings, the hearing officer is required to obtain specific information about the effect of the pain on the claimant's daily life. *Avery,* 797 F.2d at 23. The *Avery* decision lays out six factors to be considered by the hearing officer in evaluating a claimant's subjective complaints of pain:

(1) The nature, location, onset, duration, frequency, radiation, radiation, and intensity of any pain;

(2) Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

(3) Type, dosage, effectiveness, and adverse side-effects of any pain medication;

(4) Treatment, other than medication, for relief of pain;

(5) Functional restrictions; and

(6) The claimant's daily activities.

*Id.* at 29.

■ The hearing officer did not explicitly cite the *Avery* factors used to evaluate a claimant's subjective complaints of pain in deciding that her claims were not entirely credible. *See* R. at 32. His credibility determination is, however, accorded a certain degree of deference, especially when it is supported by specific findings taken from the relevant evidence at hand. *See Frustaglia v. Secretary of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987) (citing *DaRosa v. Secretary of Health & Human Servs.*, 803 F.2d 24, 26 (1st Cir.1986)). In this case, the hearing officer questioned Rand about her physical symptoms and feelings of pain, *see, e.g.,* R. at 44–49, the medication or any other measures that she is taking to alleviate the pain, *see, e.g., id.* at 49–51, the effect of the pain on her daily activities, *see, e.g., id.* at 52–53, and any aggravating factors that serve to elevate the pain, *see, e.g., id.* at 46–47.

While it may be argued that it would have been more helpful for the hearing officer explicitly to outline the *Avery* factors in making his credibility determination, it is sufficiently clear from the record that he thoroughly questioned Rand according to those guidelines at the hearing held on November 25, 2002. His decision was made in light of the evidence gleaned from the hearing along with Rand's medical history on record. Thus, the hearing officer's finding that Rand's subjective claims of pain and incapacity are not credible should be deferred to by the Court because it is supported by substantial evidence. *See Frustaglia,* 829 F.2d at 195.

3. Rand's Argument that the Hearing Officer's Conduct at the Initial Hearing Constitutes a Misapplication of the Social Security Act

■ Rand points to the initial disability determination hearing held in her case on February 20, 2002 to support her claim that the hearing officer improperly parceled out each physical problem documented on record and considered them individually as separate and distinct from the rest of her impairments. Pl.'s Mem. at 11. According to the claimant, the hearing officer evaluated the record in a piecemeal fashion in reaching his determination that Rand is not "disabled" as defined by the Social Security Act. *Id.* at 12.

The initial hearing, however, does not appear to have swayed the decision of the hearing officer or to have served as a determining factor in his findings. The body of the hearing officer's decision references Rand's medical records as a whole and contains summaries of each consulting physician's evaluation. *See* R. at 27–36. The decision does not evaluate each impairment individually; rather, the hearing officer properly discusses Rand's numerous ailments as a combination of physical and emotional problems. *See id.* Furthermore, the vocational expert, the medical expert, and the DDS reviewing physician were instructed to evaluate Rand's prospects in the workplace in light of the limitations imposed by her impairments in combination after considering the entire medical record. *Id.* at 31–35. Their determinations were therefore based on Rand's impairments in toto, and served to

corroborate the hearing officer's decision that the claimant was not physically incapacitated. Contrary to Rand's assertion that the hearing officer reviewed and dismissed the impact of each ailment ,in a piecemeal fashion, the Court holds that his decision properly was grounded in the medical evidence on record as a whole.

## IV. CONCLUSION

Accordingly, Rand's Motion for Judgment on the Pleadings [Docket No. 8], seeking reversal of the final decision of the Commissioner, is DENIED, and the Commissioner's Motion for an Order Affirming the Decision of the Commissioner [Doc. No. 11] is ALLOWED.

SO ORDERED.